Filed 6/27/14  P. v. Velasquez CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G048581 |
| v. | (Super. Ct. No. 12CF2187) |
| MIGUEL ANGEL VELASQUEZ, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Carla Singer, Judge.  Reversed.

Sylvia Whatley Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Alana Cohen Butler and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

Miguel Angel Velasquez appeals from the judgment following his conviction on counts of possession of a controlled substance for sale (Health & Saf. Code, § 11378; count 1), unlawful possession of a firearm and ammunition by a felon (Pen. Code, §§ 29800, subd. (a)(1), 30305, subd. (a)(1); counts 2 and 3), and active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a); count 4.) Defendant was also alleged to have committed these crimes for the benefit of, at the direction of, or in association with a criminal street gang. (Pen. Code, § 186.22, subd. (b).) Defendant was sentenced to an aggregate term of nine years eight months in prison.

On appeal, defendant challenges only his convictions on the counts alleging unlawful possession of a firearm and ammunition by a felon. He contends the court erred by allowing the prosecution to present evidence of a tattoo on his torso, depicting a woman brandishing an assault rifle with smoke coming from its barrel, to show his *propensity* to possess firearms in connection with his gang's criminal activity. And because there was no other direct evidence that defendant himself *possessed* the gun and ammunition which were found hidden inside a couch at the house where he was arrested, defendant claims the erroneous admission of this evidence cannot be dismissed as harmless error. We agree with both contentions.

As even the Attorney General acknowledges, the relevance of the challenged tattoo was that it "demonstrated [defendant's] willingness, as a gang member, to possess weapons . . . ." That is purely a propensity argument, which was relied upon to suggest that defendant was likely to have exercised control over whatever weapon happened to surface in his vicinity. The admission of evidence for that purpose was improper. Moreover, although the gun and ammunition defendant was convicted of possessing were found during a search of the house where defendant was arrested, defendant neither owned nor resided at that house, and neither the gun nor ammunition was visible or readily accessible to him at the time of his arrest. While the jury might still have concluded, even without the improper evidence of his propensity to handle

2

guns, that defendant would have been aware of the hidden gun and ammunition and that he shared constructive possession of them with his cohort, the other evidence supporting that conclusion was not compelling. On this record, we cannot conclude the error in admitting the tattoo evidence as a means of proving defendant's propensity to possess guns was harmless. We consequently reverse his convictions on the counts alleging unlawful possession of a firearm and ammunition.

And because our reversal of those convictions will ultimately require that defendant be resentenced, we conclude his challenge to the sentence already imposed is rendered moot.

FACTS

This case came about almost by happenstance. Investigators from the Orange County District Attorney's office went to the home of Alicia Rodriguez Jones, to speak with her about something unrelated to the charges ultimately leveled in this case. They were parked and waiting for her when she arrived, driving a car owned by her cousin, Carlos Alberto Ceja. The investigators noted the fence enclosing Jones' backyard was painted with graffiti identifying the "Los Crooks" gang.

When the investigators, who were wearing uniforms and had guns and handcuffs attached to their belts, approached Jones in her driveway, she refused to acknowledge her identity and appeared very nervous. She raised her voice in response to the investigators' questions, as if to alert persons inside the house about what was happening outside. They followed her to the front door.

When Jones opened her door to enter, the investigators followed her inside and announced their presence. They saw Ceja and defendant in the living room, moving toward a sliding glass door that opened to the backyard. The investigators ordered the two men to get down on the floor, and they complied.

3

After the men were searched, they were seated, along with Jones, on one of three couches in the living room. The residence was also searched, revealing drugs hidden in numerous places, including between the cushions on the couch where defendant, Jones and Ceja had been sitting, and in Jones's locked bedroom. Other evidence, consistent with a drug sales operation, was also found.

The search also revealed that the side of a different couch had been cut open to create a cavity, although the cut was not visible unless the couch cushions were removed. Inside the cavity an investigator found a black zippered case containing a loaded handgun, along with an additional magazine of ammunition and a holster. No drugs were found in the cavity with the gun, although drugs were found on the floor underneath that couch. No fingerprints or DNA were found on the gun.

The gun was registered to Jones's father, Jorge Rodriguez, but had been stolen from his home, along with two other guns and one of the two magazines of ammunition. Both Jones and Ceja (who was Rodriguez's nephew), but not defendant, had seen the guns at Rodriguez's house, and both of them had access to the guns before they were stolen from Rodriguez's home. Defendant had never met Rodriguez.

Defendant was charged with possession of drugs for sale and also with being a felon in possession of a gun and ammunition. He was alleged to have committed those crimes for the benefit of a criminal street gang. Defendant was also charged with the substantive crime of active participation in a criminal street gang.

Defendant has several tattoos. At trial, the prosecution sought to rely on those tattoos as evidence of his culpability for the charged crimes. Specifically, the prosecutor argued that evidence of defendant's tattoos was admissible to establish his affiliation with the Los Crooks gang. However, defendant sought to exclude evidence of the tattoo on his torso, which depicted a woman brandishing an assault rifle (not a handgun), with smoke emanating from its barrel. He argued this tattoo was not relevant to establish either the fact of his gang membership or his possession of any actual

4

weapon, and was instead profoundly prejudicial because it would suggest to the jury that a gun would be defendant's "methodology of displaying [his] brazenness towards society." And although the prosecutor expressly acknowledged that defendant had plenty of other tattoos evidencing his affiliation with the Los Crooks gang – including one which simply read "Ladrones," the Spanish equivalent of "crooks" – he argued this particular tattoo of the woman with a gun was nonetheless distinctly relevant to the crimes charged because "the focus of the gun" indicates that defendant is "willing to use guns and [is] willing to use them for the benefit of the gang." The court agreed with the prosecutor, explaining that while "there is some prejudicial effect . . . , [the tattoo is] still highly probative on the issues of gang involvement, firearm possession, ammunition possession." The court consequently overruled defendant's objection to admission of this particular tattoo into evidence.

The prosecution's gang expert later testified that a gang member's tattoo depicting a firearm symbolizes his "willingness to use firearms."

DISCUSSION

1. *It was Error to Admit the Evidence.*

Defendant's primary contention on appeal is that his convictions on the counts alleging possession of a handgun and possession of ammunition must be reversed because the trial court erred by admitting his torso tattoo into evidence. Defendant argues the tattoo evidence amounted to nothing more than evidence that he had a *propensity* to possess firearms, which is inadmissible. Specifically, as bolstered by the testimony of the prosecution's gang expert, defendant's tattoo was relied upon to suggest that defendant was someone who was *willing to use a gun* – a fact the trial court agreed was highly probative on the charges of firearm and ammunition possession.

5

We apply a deferential abuse of discretion standard when reviewing a trial court's decision to admit evidence. (*People v. Lewis* (2001) 25 Cal.4th 610, 637.) Under that standard, "[a] trial court's exercise of discretion in admitting or excluding evidence . . . will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.) Applying that standard here, we agree it was error to admit this tattoo evidence.

Evidence Code section 1101, subdivision (a), states the general rule that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) *is inadmissible* when offered to prove his or her conduct on a specified occasion." (Italics added.) While there are exceptions to this general rule, none of them are applicable here.

In *People v. Barnwell* (2007) 41 Cal.4th 1038, 1056, a murder case, our Supreme Court swiftly condemned the trial court's admission of testimony evidencing that the defendant had previously possessed a gun with "'relatively unique' characteristics" to demonstrate his "*propensity* to own or carry" the type of weapon used in the charged murder. (*Id.* at pp. 1055-1056.) The court explained "it is error to admit evidence that other weapons were found in defendant's possession, for such evidence tends to show not that he committed the crime, *but only that he is the sort of person who carries deadly weapons*." (*Id.* at p. 1056, italics added.)

That is exactly the problem with the tattoo evidence in this case. It told us nothing about whether defendant actually had possession of the gun or ammunition found hidden in the house where he was arrested. Instead, it was relied upon only to persuade the jury that defendant was *the sort of person who is willing to use guns*. But that is the very purpose for which Evidence Code section 1101, subdivision (a), deems this evidence inadmissible.

6

Without even acknowledging Evidence Code section 1101, subdivision (a) – which defendant relies upon significantly in his opening brief – the Attorney General argues defendant's tattoo evidence was properly admitted because it constituted probative evidence of his "affinity for guns," relying on *People v. Kennedy* (2005) 36 Cal.4th 595 (*Kennedy*), overruled on other grounds in *People v. Williams* (2010) 49 Cal.4th 405, 459. But defendant's "affinity for guns" is just another way of characterizing his *propensity* to use guns, which is a prohibited use of this evidence.

The Attorney General quotes *Kennedy* for the proposition that "the existence of a gun tattoo on someone's body gives rise to the inference that that person may be familiar with and be around guns." (*Kennedy, supra*, 36 Cal.4th at p. 619.) But while that factual statement is unassailable – and rather neatly describes how propensity evidence works – nothing in *Kennedy* suggests that it would have been appropriate *to admit* such evidence in the circumstances of this case. In *Kennedy*, evidence of the defendant's tattoos was admitted for purposes of establishing his identity, not to establish his propensity to use guns. It was only after the defendant introduced evidence suggesting he *did not* handle guns, that the prosecutor pointed to his tattoo as rebuttal evidence. Such use is expressly approved under Evidence Code section 1102, subdivision (b): "In a criminal action, evidence of the defendant's character or a trait of his character in the form of an opinion or evidence of his reputation is not made inadmissible by Section 1101 if such evidence is [¶] . . . [¶] (b) Offered by the prosecution to rebut evidence adduced by the defendant under subdivision (a)."

The Attorney General also relies on *People v. Ochoa* (2001) 26 Cal.4th 398 (*Ochoa*), abrogated on another point as noted in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14), for the proposition that evidence of a defendant's tattoos is admissible to establish his commission of a charged crime. However, *Ochoa* is also distinguishable. In that case, the evidence demonstrated that the defendant, who had also been charged with murder, added a tattoo of the number 187 (the section of the Penal Code defining the

7

crime of murder) to his body *after* the charged murders were committed. The Supreme Court agreed that admitting evidence of the defendant's new tattoo was proper because it "could be viewed *as an admission* of defendant's guilt." (*Ochoa,* at p. 437, italics added.) Nothing in *Ochoa* suggests it would also be proper to admit evidence of a defendant's tattoo to establish his mere propensity to commit the charged crime.

The Attorney General also defends the court's decision to admit this tattoo evidence on the ground it was not unduly prejudicial, because it "was *the only tattoo . . .* which exhibited [defendant's] affinity for firearms." (Italics added.) But that simply begs that question. The problem with this tattoo was not that it was cumulative on the issue of defendant's affinity for guns, but that it evidenced *nothing more* than that. Because defendant's "affinity for firearms" was not an appropriate basis upon which to convict him of possessing the specific gun and ammunition uncovered in the search of Jones's house, any evidence which proved *only* that affinity was, by definition, prejudicial.

The only other justification offered for admitting the evidence of defendant's torso tattoo was that it also tended to support the conclusion that defendant was a gang member. The trial court characterized the tattoo as "highly probative on the issue[] of gang involvement." We cannot agree. Even setting aside the fact that everyone agreed defendant had plenty of *other* tattoos which clearly evidenced his gang membership, there is no substantial evidence that this particular tattoo actually did that. To be sure, the gang expert testified that gun tattoos were "part of the gang culture." But there was no evidence that similar gun tattoos would not also be found *outside the gang culture*. These days, neither a love of tattoos, nor a love of guns, is limited to gang members. At most, the expert's testimony demonstrated that if defendant was otherwise shown to be a gang member, as his other tattoos strongly suggested was the case, this tattoo, depicting a gun, took on a particular significance within that gang culture. But this tattoo, standing alone, did not evidence gang membership.

8

Finally, we also reject the related suggestion that the tattoo was admissible for the narrow purpose of showing that defendant would have possessed any gun specifically *for the benefit of the gang*, and thus that he had committed his charged crimes for the benefit of the Los Crooks gang. Again, this would amount to improper propensity evidence: i.e., "whenever this defendant carries a gun, he will be doing it for the gang."

Because defendant's torso tattoo, depicting a woman holding a gun, was probative only to demonstrate his "affinity for firearms," which is impermissible propensity evidence, we conclude it was error for the court to admit it into evidence.

*2. The Error Requires Reversal of Defendant's Convictions for Possession of a Hangun and Ammunition.*

Having concluded the admission of this evidence was erroneous, we also conclude that error requires reversal of defendant's convictions on the counts charging possession of a firearm and ammunition by a felon. Defendant argues reversal is required unless we determine the improper admission of evidence was "harmless beyond a reasonable doubt." (See *People v. Barnwell, supra*, 41 Cal.4th at p. 1057 [noting the erroneous admission of testimony "was clearly harmless beyond a reasonable doubt"].) The Attorney General argues reversal is only required if we conclude it is reasonably probable the verdict would have been more favorable to defendant absent the error. (Citing *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We believe reversal is required under either standard. Under the *Watson* standard, "a 'probability' . . . does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*" that the outcome would have been more favorable. (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) This case meets that standard.

While there was plenty of evidence supporting the jury's determination that defendant possessed drugs for sale, and that he was a gang member who engaged in that

crime for the benefit of his gang, there was precious little evidence that *he* had possession of the gun and ammunition which were found hidden inside the couch at the home where he was arrested. Possession of a weapon can be actual or constructive. "Actual possession means the object is in the defendant's immediate possession or control. A defendant has actual possession when *he himself has the weapon*. Constructive possession means the object is not in the defendant's physical possession, but the defendant *knowingly exercises control or the right to control the object*." (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 831, italics added.)

Even the Attorney General makes no claim that the evidence suggested defendant had actual possession of the gun and ammunition. Instead, she contends circumstantial evidence demonstrated in fairly compelling fashion that defendant *shared constructive possession* of the gun and ammunition with Ceja at the time of his arrest. We cannot agree.

Tellingly, the Attorney General stretches the evidence a bit by claiming the handgun was found in a location "where [defendant] was in close proximity" and was "seen fleeing from." Contrary to the Attorney General's implication, the evidence was that defendant and Ceja were fleeing *toward the sliding glass door* when the investigators arrived, rather than *away from* any specific thing in the room. Moreover, the gun and ammunition – which were located inside a box, hidden inside a cavity formed in the side of a couch that was only visible when the couch cushions were removed – were neither openly displayed nor readily accessible to defendant. Although defendant was in the same room with that couch – and hence the gun – when the investigators arrived, there was no direct evidence defendant even knew the gun was there, let alone that he had ever exercised control over it.

It may be true, as the Attorney General claims, that even without knowing of defendant's gun tattoo, the jury could have inferred that *Ceja* knew about the gun – which he might well have personally stolen from his uncle's house – and that Ceja would

10

have shared that information with defendant, his fellow gang member, and the two of them would have then exercised joint control over the gun as part of their drug business. But that string of compound inferences was certainly not *required*. The jury might have just as easily inferred that it was Jones, who lived at the house and owned the couch where the gun had been stashed, who had stolen the gun from her father, and that neither Ceja nor defendant was even aware she had it.

Stated simply, while it is possible the jury would have still convicted defendant of these gun and ammunition possession counts even without the "highly probative" evidence of the tattoo demonstrating his claimed "affinity for firearms," the remaining evidence to support those convictions was fairly thin. We consequently conclude it is at least reasonably probable – i.e., that there was more than an abstract possibility – the verdict would have been more favorable to defendant on these counts absent the erroneous admission of the evidence of his gun tattoo. In light of that determination, defendant's convictions on those counts cannot stand.

*3. The Claimed Sentencing Error is Moot.*

Defendant's only remaining contention is that the court improperly imposed an aggravated sentence on him, in retaliation for defendant's exercise of his right to remain silent and his right to trial. However, as we have already concluded the judgment must be reversed, any error in the imposition of defendant's sentence is rendered moot. When defendant is resentenced following final resolution of the gun and ammunition possession counts alleged against him, he can challenge any error in that sentence as part of an appeal from the new judgment.

11

DISPOSITION

Defendant's convictions on the gun and ammunition possession counts are reversed. The judgment is consequently reversed as well, and the matter is remanded to the trial court for a new trial on these counts.


RYLAARSDAM, ACTING P. J.

WE CONCUR:


ARONSON, J.


IKOLA, J.

12